# IN THE UNITED STATES DISTRICT COURT
## FOR THE  DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRI-M GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-556-SLR |
| | ) | |
| THOMAS B. SHARP, SECRETARY, DELAWARE DEPARTMENT OF LABOR, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## RESPONSE OF PLAINTIFF TRI-M GROUP, LLC,
## IN OPPOSITION TO DEFENDANT'S
## SUPPLEMENTAL BRIEF IN SUPPORT OF HIS MOTION TO DISMISS

OF COUNSEL:

Stephen J. Sundheim
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
Telephone:  (215) 981-4000
Facsimile:  (215) 981-4750

Dated:  June 16, 2008

M. Duncan Grant (Del. Bar No. 2994)
Matthew A. Kaplan  (Del. Bar No. 4956)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE   19899-1709
Telephone:  (302) 777-6500
Facsimile:  (302) 421-8390

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ...................................................................................................1

        A.      Nature And Stage Of Proceeding.............................................................1

        B.      Summary Of Argument.............................................................................1

II.     ARGUMENT .........................................................................................................2

        A.      The Court Should Not Consider Defendant's Supplemental Brief
                To The Extent That It Exceeds The Scope Of The Court's April
                22, 2008 Order And Contains Unverified Factual Representations .......................2

        B.      Defendant's Preemption Argument Misses The Point.............................4

        C.      It Is Not "Unmistakably Clear" That Congress "Consented" To
                Delaware's Discriminatory Treatment Of Out-Of-State Interests..........................4

        D.      Tri-M Has Standing To Challenge The Constitutionality Of
                Delaware's Regulations .............................................................................7

        E.      Even If Defendant Could Justify Delaware's Unconstitutional
                Conduct By Invoking "Majority Rule," He Has Not Established
                That Delaware's Permanent Place Of Business Requirement Is In
                The Majority ..............................................................................................8

III.    CONCLUSION.....................................................................................................11

# TABLE OF AUTHORITIES

*Granholm v. Heald*,
    544 U.S. 460 (2005)............................................................................5

*Joint Apprenticeship & Training Council v. New York State Dep't of Labor*,
    829 F. Supp. 101 (S.D.N.Y. 1993)......................................................8

*Norfolk Southern Corp. v. Oberly*,
    822 F.2d 388 (3d Cir. 1987)...............................................................5

*Siuslaw Concrete Construction Co. v. Washington, Dep't of Transp.*,
    784 F.2d 952 (9th Cir. 1986) .............................................................7

*South-Central Timber Dev., Inc. v. Wunnicke*,
    467 U.S. 82 (1984)...........................................................................5, 7

*United States v. Virginia*,
    508 F. Supp. 187 (E.D. Va. 1981) .....................................................3

# I.    INTRODUCTION

## A.    Nature And Stage Of Proceeding

Plaintiff Tri-M Group, LLC ("Tri-M"), brought this action for declaratory and injunctive relief against Defendant Thomas B. Sharp ("Defendant"), the Secretary of the Delaware Department of Labor ("DDOL"), based on DDOL's discriminatory and unconstitutional regulation of the employment of apprentices on state-funded construction projects in Delaware. Thereafter, Defendant moved to dismiss the action.

On April 22, 2008, the Court heard oral argument on Defendant's Motion to Dismiss and requested supplemental briefing from Defendant to be filed no later than May 27, 2008. (April 22, 2008 Order, D.I. 39). Defendant filed his Supplemental Brief in Support of His Motion to Dismiss on May 27, 2008 (the "Supplemental Brief", D.I. 41). On June 4, 2008, the Court granted Tri-M an extension of time until June 16, 2008, to respond to the Supplemental Brief. (D.I. 42). This is Tri-M's Response in Opposition to Defendant's Supplemental Brief.

## B.    Summary Of Argument

(1)    The Court should not consider Defendant's Supplemental Brief to the extent that it (a) exceeds the scope of the Court's April 22, 2008 Order and (b) contains unverified factual representations;

(2)    Defendant's preemption argument is irrelevant to the present action;

(3)    Congress has not consented to Delaware's discriminatory apprentice regulations;

(4)    Tri-M has standing to pursue its claims; and

(5)    Even if Defendant could justify Delaware's unconstitutional conduct by invoking "majority rule," he has not established that Delaware is in the majority.

II.    **ARGUMENT**

A.    **The Court Should Not Consider Defendant's Supplemental Brief
To The Extent That It Exceeds The Scope Of The Court's April 22,
2008 Order And Contains Unverified Factual Representations**

On April 22, 2008, this Court held oral argument on Defendant's Motion to

Dismiss Tri-M's Complaint.  Near the conclusion of the argument, the Court requested that

counsel for Defendant, Ms. Carmichael, report to the Court on whether other states "have the

same kind of regulation" as the Delaware regulation that is the subject of the present litigation.

(April 22, 2008 Tr. at 34, D.I. 40).  Later the same day, the Court entered its written Order,

which provided (in pertinent part) that "[o]n or before May 27, 2008, defendant may supplement

the record with evidence of:  (a) States with regulations similar to those at issue, that is Section

III.D.1.a. of the Delaware Prevailing Wage Regulations and Section 3.1 of the Delaware

Apprenticeship and Training Rules and Regulations; and (b) legislative history that sheds light

on why there is no reciprocity among States as to apprenticeship programs in the building and

construction industries."  (April 22, 2008 Order, D.I. 39).

In response to that Order, on May 27, 2008, Defendant filed his Supplemental

Brief, the vast majority of which is devoted to matters beyond the scope of the Court's April 22

Order.  Specifically, in Section I (pages 3-12), Defendant spends 10 pages of a 20-page brief

raising entirely new arguments.  In Section II (pages 13-14), Defendant readdresses the standing

argument that he raised in his Motion to Dismiss, previously briefed in both his opening and

reply memoranda in support of that Motion, and in which the Court expressed no interest at oral

argument.  (April 22, 2008 Tr. at 3, D.I. 40).  It is inappropriate for Defendant to attempt now

(albeit unsuccessfully), in the guise of responding to a narrow Court Order, to raise new

arguments, or bolster old ones, in support of his Motion to Dismiss.  For that reason alone, the

Court should disregard the Supplemental Brief to the extent it addresses matters outside the

Court's April 22, 2008 Order.  Moreover, for the reasons set forth in Sections B through D,

below, Defendant's legal arguments on these points are incorrect.

Defendant does finally attempt to address the Court's April 22 Order in the last

few pages of his Supplemental Brief (Section III, pages 15 to 19).  However, he does so

incompletely and improperly.  Defendant has supplied *no* legislative history shedding light on

the issue of "reciprocity" (or a lack thereof) for apprenticeship training programs in the building

and construction industries.  And while Defendant has provided information on certain state

regulations he contends are similar to Delaware's, he has done so by submitting what is largely

an unverified, unsworn summary of his counsel's *personal* contacts with various State

Apprenticeship Council ("SAC") representatives.  In one instance (Montana), Defendant relies

on what appears to be a transcribed voicemail message relaying an "unwritten" (and borderline

incoherent) policy.  (Supp. Br. at 17, D.I. 41; Ex. O to Supp. Br.)  In an another (Florida), he

relies on some unidentified state regulation, policy or practice (it is impossible to tell which) to

support his position.  (Supp. Br. at 16, D.I. 41).

Such a "speaking motion" is improper regardless of the reliability of counsel.

*Cf. United States v. Virginia*, 508 F. Supp. 187, 187 (E.D. Va. 1981) ("The Court has confidence

in the veracity of counsel for the United States.  The Court acknowledges that even his most

casual remarks addressed to the Court would be truthful.  Accordingly, the Court has no doubt

that the statements made in the brief by counsel, though not sworn to, are truthful.  It is

noteworthy, also, that opposing counsel has not attacked the factual basis of counsel's plea.

Nevertheless, the Court would be ill-advised to make it a practice to accept 'speaking briefs'

from some lawyers and not others.  Were the Court inclined to grant the motion it would first

require the requisite showing from plaintiff rather than the recitation of facts set forth in the

brief."). Accordingly, the Court should disregard Defendant's exhibits I, K, O, R, S and T in their entirety, as well as the first two pages of exhibit M, as none of these is a state regulation. The Court also should disregard counsel's characterization (in the chart set forth on pages 15-19) of any state practice, policy, rule or regulation based upon her personal contacts with any SAC representative.[1]

**B.    Defendant's Preemption Argument Misses The Point**

Defendant spends the first several pages of his brief suggesting that, because the Fitzgerald Act does not preempt state action in the field of apprentice regulation, Delaware's regulations are immune from constitutional challenge. (Supp. Br. at 3-10, D.I. 41). As a practical matter, Tri-M has never argued that Delaware lacks the authority to regulate apprentices (or their employers) working within its borders. Tri-M's position is, and has been, that Delaware may not do so in a manner that unconstitutionally discriminates against out-of-state interests. (*E.g.*, Compl. ¶¶ 1, 30-36, D.I. 1). Defendant's lengthy discussion of preemption is irrelevant.

**C.    It Is Not "Unmistakably Clear" That Congress "Consented" To Delaware's Discriminatory Treatment Of Out-Of-State Interests**

At the tail end of his preemption argument, Defendant suggests that the concept he actually is grasping for is "Congressional consent," (Supp. Br. at 12, D.I. 41).—that is, the notion that Congress intended to permit Delaware and other states to control this particular aspect of interstate commerce and, therefore, that Delaware's regulations are insulated from challenge under the Commerce Clause. As Defendant himself notes, however, Congressional

---

[1] Requiring that Defendant rely only on the relevant state laws or regulations themselves is not some mere technicality, particularly given that Tri-M's own counsel received different responses when he contacted certain of the state agencies. (Declaration of Stephen J. Sundheim, attached as Ex. 1; *see also* Section II.E, *infra*.) At this pre-summary judgment stage of the case, it is inappropriate to put in issue the non-codified and in some cases unwritten policies or practices of other states, which must be established as a factual matter. It is all the more inappropriate to do so where Defendant has no proper evidence of those policies or practices before the Court and where, in light of the Sundheim Declaration, there is a factual dispute between the parties.

consent is a defense to a Commerce Clause challenge only where Congress's intent is "***unmistakably clear***." (*Id.*, emphasis added.) Moreover, the relevant intent is not, as Defendant suggests, an intent merely to permit state regulation. Rather, it must be "unmistakably clear" that Congress intended to permit ***discriminatory*** state regulation. For example, in *Norfolk Southern Corp. v. Oberly*, a case Defendant himself relies upon, the Court considered a challenge to a Delaware law banning bulk product transfer facilities in Delaware's coastal zone. 822 F.2d 388, 390 (3d Cir. 1987). Defendants in that case argued that the federal Coastal Zone Management Act ("CZMA") "constitute[d] Congressional consent for the ban, immunizing it from dormant Commerce Clause scrutiny." *Id.* The Third Circuit disagreed, finding no "evidence that Congress intended to sanction resolutions that would otherwise be unconstitutional." *Id.* at 397; *see also id.* at 396 ("[C]onsistency with a general federal policy that is not inherently discriminatory is not a basis for finding consent.").[2] *South-Central Timber Dev., Inc. v. Wunnicke*, also cited by Defendant, is to the same effect. 467 U.S. 82, 92 (1984) ("The fact that the state policy in this case appears to be consistent with federal policy—or even that state policy furthers the goals we might believe that Congress had in mind—is an insufficient indicium of congressional intent."); *see also, e.g.*, *Granholm v. Heald*, 544 U.S. 460, 489 (2005) ("State policies [regulating liquor] are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent. The instant cases, in contrast, involve straightforward attempts to discriminate in favor of local producers. The discrimination is contrary to the Commerce Clause and is not saved by the Twenty-first Amendment."). Simply

---

[2] Finding no Congressional consent to Delaware's regulation of interstate commerce, the Third Circuit in *Norfolk Southern* reached the merits of the challenge. It concluded that, because (unlike the regulation here) the law in question did not discriminate against out-of-state interests on its face or in application and was not shown to have been motivated by an improper purpose, the statute was not subject to heightened scrutiny. 822 F.2d at 402-03. The state statute in that case survived under the less rigorous balancing test. *Id.* at 406-07.

put, Congress permitting states to "regulate their own apprentice programs," (Supp. Br. at 12, D.I. 41), is not at all the same thing as Congress permitting states to regulate their own apprentice programs *in a discriminatory manner*.

Moreover, although Defendant suggests that the Fitzgerald Act and the federal regulations promulgated thereunder permit Delaware to discriminate by denying "reciprocity" to Tri-M and others in the building and construction industries, (Supp. Br. at 9, D.I. 41), Delaware is not merely denying reciprocity. "Reciprocity" under Section 6.24 of the Apprenticeship Regulations entitles the sponsor of an apprenticeship program "registered . . . by any State apprenticeship agency" to "[r]egistration of approval reciprocity" *upon request*. In other words, reciprocity entails the right to obtain program approval in Delaware based on nothing more than the fact that the same program already has been approved in another SAC state. Under Section 3.1 of the Apprenticeship Regulations, however, Delaware *also* is denying Tri-M the right to become an apprenticeship training program sponsor—and thus to obtain approval of an apprenticeship training program in Delaware *other than through reciprocity*—merely because Tri-M does not have a permanent place of business in Delaware. This is distinct from a denial of reciprocity, and Defendant has identified *nothing* in the Fitzgerald Act itself or the regulations thereto that makes it unmistakably clear that Congress intended to permit Delaware to place Tri-M in a disadvantageous position compared to in-state contractors, just because Tri-M does not maintain a permanent place of business in Delaware.

Further, even if Congress approved of discrimination in granting reciprocity to apprenticeship training programs "for federal purposes," (*id.* at 9) (and nothing in Defendant's brief makes it "unmistakably clear" that Congress did so approve), Defendant has made it abundantly clear that he is applying Delaware's apprenticeship regulations for state—*not*

federal—purposes.  Specifically, Delaware's Department of Labor initially requested payroll and

other information from Tri-M "to ensure compliance with ***Delaware's*** Prevailing Wage law"

and, based on that information, determined that Tri-M was "in violation of ***Delaware's***

Prevailing Wage law (29 Del. C. § 6960) and Prevailing Wage Regulation III.D.A."  (May 9,

2006 letter from Daniel Nelson, Ex. A to Compl., D.I. 1, emphasis added.[3])  Under these

circumstances, Delaware may not rely on the federal law or regulations to support its policies.

*Cf. South-Central Timber*, 467 U.S. at 92-93 ("Congress acted only with respect to federal lands;

we cannot infer from that fact that it intended to authorize a similar policy with respect to state

lands.").[4]

>    **D.    Tri-M Has Standing To Challenge The**
>    **Constitutionality Of Delaware's Regulations**

As set forth in Section II.A, above, Defendant's attempt to revisit its standing

argument is improper under the Court's April 22, 2008 Order.  Its supplemental briefing on this

point also is little more than a rehash of the arguments Defendant made previously.  (*See* Def.'s

Mem. in Supp. of Mot. to Dismiss at 12-13, 17-19, D.I. 7; Def.'s Reply in Supp. of Mot. to

Dismiss at 9-11, D.I. 11).  Defendant's new reliance on the 25-year old decision in *Joint*

*Apprenticeship & Training Council v. New York State Dep't of Labor*, (Supp. Br. at 13-14, D.I.

41), adds nothing of substance.  Notably, despite questioning the plaintiff's standing to enjoin the

New York Department of Labor from deregistering or deactivating its apprentice program, the

---

[3] *See also, e.g.,* June 1, 2006 letter from Daniel Nelson, Ex. B to Compl., D.I. 1 ("The Department of Labor . . . has decided not to bring legal action against you at this time for violations of Delaware's Prevailing Wage law . . . ."); June 23, 2006 letter from Thomas B. Sharp, Ex. C to Compl. ("Since the Project received state funding it was subject to the provisions of 29 *Del C.* § 6960 ('the Prevailing Wage Statute').").

[4] *Siuslaw Concrete Construction Co. v. Washington, Dep't of Transp.*, cited by Defendant in support of his "preemption" theory, reinforces this conclusion.  784 F.2d 952, 958 (9th Cir. 1986) ("The Washington statute is a minimum wage law enacted by the State as an exercise of its police power.").

court went on to address plaintiff's entitlement to a preliminary injunction on the merits.  829 F.

Supp. 101, 105 (S.D.N.Y. 1993) ("In any event, plaintiff has not demonstrated that it will be

irreparably harmed by the deactivation.").

        In any event, as set forth in Tri-M's Brief in Opposition to Defendant's Motion to

Dismiss, a constitutional challenge to Delaware's regulations brought under Section 1983 is not

the same thing as a claim under the Fitzgerald Act.  (*See* Tri-M's Br. in Opp'n to Mot. to Dismiss

at 13-15.)  For the reasons set forth in its original opposition brief, Tri-M has standing to

challenge the constitutionality of Delaware's regulations.

### E.    Even If Defendant Could Justify Delaware's Unconstitutional Conduct By Invoking "Majority Rule," He Has Not Established That Delaware's Permanent Place Of Business Requirement Is In The Majority

        As noted in Section II.A, above, Defendant has submitted various state

regulations he contends are similar to Delaware's apprenticeship regulations, as well as, in some

instances, unverified statements about various state policies or practices that he contends reflect

policies or practices similar to that of Delaware.  Defendant has failed to supply regulations from

states that did not "respond" to his counsel's inquiries.  (Supp. Br. at 19, D.I. 41).  On the basis

of this submission, Defendant contends that "the majority" of the 27 SAC states surveyed has

"some rule, regulation or polic[y] requiring some sort of place of business requirement in the

registering state."  (*Id.*)  This is incorrect.  Defendant again is confusing reciprocity with the

distinct requirement that an employer maintain a permanent place of business to become an

apprenticeship training program sponsor, and only arrives at his bare majority of 14 by

improperly lumping together states with a variety of different regulations.  Defendant's

representations regarding these states' practices are, in some cases, also unsupported—and even

contradicted—by the written materials appended to his Supplemental Brief.

For instance, Defendant contends that, as of May 2008, no one on Arizona's Apprenticeship Program List has an out-of state address.  (*Id.* at 15.)  Even putting aside that it is improper for Defendant to offer facts outside the Complaint in support of his Motion to Dismiss and putting aside that, if it were appropriate for Defendant to offer facts, the proper way to establish them would be through testimony or other evidence (not an unverified brief), the lack of out-of-state addresses may well reflect nothing more than the fact that no out-of-state contractor currently sponsors an apprenticeship training program in Arizona.  Indeed, unlike Delaware, Arizona defines sponsor to mean "***any*** employer, association, or management/labor committee who chooses to develop an apprenticeship program for training employees and has the program registered by the state registration agency."  (Ex. H to Supp. Br. at § 2(r), D.I. 41, emphasis added).  Nor, tellingly, did Defendant identify any other requirement in the Arizona regulations comparable to Delaware's permanent place of business requirement for sponsorship.[5] (Supp. Br. at 15, D.I. 41).

Contrary to Defendant's view, Kansas also falls into the "No" column.  "Sponsor" is defined without respect to residence or place of business and, regardless of what supposedly was represented to Defendant's counsel, Part X of the Kansas Apprenticeship Council Policy Manual does ***not*** require an "office of record" in the State.  (Ex. K to Supp. Br.  at § II.5, § X, D.I. 41).[6]  Kentucky's regulations are much the same.  They define "sponsor" (in pertinent part)

---

[5] In response to inquiries by Tri-M's counsel, Dennis Cahill, the Director of the Arizona Workforce Development, Apprenticeship Office, represented that Arizona has permitted and would continue to permit the use by an out-of-state contractor of apprentices registered in another state.  (Ex. 1, Sundheim Decl. at ¶ 3.)

[6] The legal effect of this "manual" is uncertain.  Further, even if Kansas did impose an "office of record" requirement, Defendant has offered nothing to suggest that an "office of record" and a "permanent place of business" are the same thing.  A site trailer like that Tri-M maintains in Delaware might well serve as an "office of record."  The Massachusetts requirement that records be located in the state and other conditions on apprenticeship program sponsors also do not necessarily require a permanent place of business in Massachusetts.  (Ex. N to Supp. Br. at § 7.04(e), D.I. 41).  Pennsylvania's "located in or doing business in" the Commonwealth requirement also is

(continued...)

to mean "any person, association, committee, or organization in whose name or title the program is or is to be registered," and Defendant does not contend that they otherwise impose any residency requirement.[7]  (Supp. Br. at 16, D.I. 41; Ex. L to Supp. Br. at § 1(7), D.I. 41).  Maine's regulations (notwithstanding the "policy" expressed in the email correspondence with Defendant's counsel) likewise impose no permanent place of business requirement for sponsors. (Ex. M to Supp. Br. at § 1.2(F), D.I. 41).  Further, Maine's regulations do **not** preclude reciprocity in the building and construction industries.  (*Id.* § 1.11.[8])  Rhode Island presently has no place of business requirement for program sponsors.  (Supp. Br. at 18, D.I. 41; Ex. R to Supp. Br. at § 2.f., D.I. 41).  The proposed change Defendant cites is just that—proposed.  At this time, Rhode Island also does not categorically exclude the building and construction industries from requesting reciprocity.  (A copy of the Rhode Island regulations as available on Westlaw as of June 16, 2008, is attached hereto as Ex. 2.)

        "Majority rule" is not a method of determining constitutional issues.  Even if it were, Defendant cannot claim the majority on this point.

_____

(continued...)

not obviously equivalent to Delaware's "permanent place of business" requirement.  (Ex. Q to Supp. Br. at § 83.2, D.I. 41).  Virginia too appears to require only an "established physical address," which again is not necessarily the same thing as a "permanent place of business."  As is true of Kansas, moreover, the legal effect of the Virginia "guidelines" Defendant has submitted is uncertain.

    [7] Despite Kentucky's written policy against reciprocity in the building and construction industry, a representative of the Commonwealth advised Tri-M's counsel that an out-of-state contractor that is a participant in a another state's federally recognized apprentice program would be permitted to use its apprentices on public works projects in Kentucky and to pay them at apprentice rates.  (Ex. 1, Sundheim Decl. at ¶ 4.)

    [8] Representatives of Maine advised Tri-M's counsel that their policy on reciprocity is consistent with the regulation.  (Ex. 1, Sundheim Decl. at ¶ 6.)

III.    <u>CONCLUSION</u>

Defendant has expressly conceded the discriminatory effect of requiring

apprenticeship training program sponsors to have a permanent place of business in Delaware.

According to Defendant himself, "[t]here is an economic advantage for contractors that sponsor

bona fide apprentice programs and utilize apprentices on public works projects." (Def.'s Br. in

Support of Mot. to Dismiss at 16, D.I. 7). By virtue of its permanent place of business

requirement for sponsorship, Delaware is denying that "economic advantage" to out-of-state

contractors. In the absence of clear Congressional consent, such discrimination is

unconstitutional. (*See* Tri-M's Br. in Opp'n to Mot. to Dismiss. at 15-16, D.I. 9 (and cases cited

therein)).

For all of the reasons set forth herein and in Tri-M's Brief in Opposition to

Defendant's Motion to Dismiss, Defendant's Motion should be denied.

Respectfully submitted,


*/s/ Matthew A. Kaplan*

OF COUNSEL:                          M. Duncan Grant (Del. Bar No. 2994)
                                     Matthew A. Kaplan  (Del. Bar No. 4956)
Stephen J. Sundheim                  PEPPER HAMILTON LLP
PEPPER HAMILTON LLP                  Hercules Plaza, Suite 5100
3000 Two Logan Square                1313 N. Market Street
Eighteenth & Arch Streets            P.O. Box 1709
Philadelphia, PA  19103-2799         Wilmington, DE   19899-1709
Telephone:  (215) 981-4000           Telephone:  (302) 777-6500
Facsimile:  (215) 981-4750           Facsimile:  (302) 421-8390

Dated:  June 16, 2008

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 16th day of June, 2008, a true and

correct copy of the ***Response Of Plaintiff Tri-M Group, LLC, In Opposition To Defendant's***

***Supplemental Brief In Support Of His Motion To Dismiss*** was filed electronically with the

Court, which filing constitutes service as to the following counsel of record:

Linda M. Carmichael
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, DE  19801
*Attorneys for Defendant*

/s/ *Matthew A. Kaplan*
Matthew A. Kaplan  (Del. Bar No. 4956)

# EXHIBIT 1

DECLARATION OF STEPHEN J. SUNDHEIM

I, Stephen J. Sundheim, make the following declaration in connection with Defendant Thomas B. Sharp's Supplemental Brief in Support of his Motion to Dismiss ("Defendant's Supplemental Brief"):

1.     I am an attorney for plaintiff, Tri-M Group, LLC.

2.     In connection with the chart contained in Defendant's Supplemental Brief, at pages 15-19, I made several calls to attempt to verify some of the information represented in the chart.

3.     On June 5, 2008, I spoke with Dennis Cahill, the Director of the Arizona Workforce Development, Apprenticeship Office.  Mr. Cahill told me that, if an out of state contractor were to perform a public works project in Arizona and request to use its apprentices on the project, Arizona would require proof that the contractor's apprentices were registered in another state.  Once that information was received, the apprentices registered in the foreign state would be permitted to work in Arizona at the project's apprentice rates.  Mr. Cahill said that he recalled only one situation where this occurred.  In that situation, which occurred several years ago, an apprentice registered in Colorado was permitted to work in Arizona upon a showing that that the apprentice was properly registered in Colorado.

4.     On June 5, I spoke to Mike Heightchew, the Apprenticeship Coordinator in Kentucky, who was referred to me by Michael Dickson (identified in Defendant's Supplemental Brief).  Mr. Heightchew told me that an out of state contractor that is a participant in a another state's federally recognized apprentice program would be permitted to use its apprentices on public works projects in Kentucky and to pay them the apprentice rates.

5.     On June 5, I spoke with Robert Grisar, the Director of Apprenticeship with Florida's Department of Education.  He told me that Florida does not have a separate department of labor.  Mr. Grisar told me that, as far as he knows, an out of state contractor that does not have a permanent place of business in Florida would be permitted to use its apprentices in Florida on a public works project if adequate certification was provided from the out of state contractor's state apprentice program showing that the apprentices were properly registered in that state.

6.     On June 6, 2008, I spoke with Gene Ellis, Maine's Director of Apprenticeship Standards, and to William Peabody, of the Maine Bureau of Labor Standards, both of whom confirmed that Maine recognizes apprentices who are registered in other states.  Mr. Ellis told me that out of state contractors are permitted to use apprentices registered in other states if those apprentices are properly registered and if the contractor provides notification and registration information in advance so that Maine can verify the information with the apprentice committee of the apprentices' home state.  Upon inquiry from the Bureau of Labor Standards (Mr. Peabody), Mr. Ellis would then provide information on the apprentices' status.  Mr. Peabody confirmed that, if he is informed by Mr. Ellis that an apprentice is properly registered with a state apprentice

agency or the federal government, his role is to verify that the apprentice is being paid the correct amount in accord with Maine's apprentice wage provisions for prevailing wage projects.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 16, 2008.

Stephen J. Sundheim

# EXHIBIT 2

Westlaw.

RI ADC 16 060 003
R.I. Code R. 16 060 003
16 060 CRIR 003

## CODE OF RHODE ISLAND RULES
## 16. DEPARTMENT OF LABOR AND TRAINING
## 060. DIVISION OF PROFESSIONAL REGULATION
## 003. RULES AND REGULATIONS RELATING TO LABOR STANDARDS FOR THE REGISTRATION OF APPRENTICESHIP PROGRAMS

Copr. (C) 2008 Thomson Reuters/West. No claim to original U.S. Govt. works.

Current with amendments filed through the May 2008 Register.

16 060 003. Rules and Regulations Relating to Labor Standards for the Registration of Apprenticeship Programs

Sec. 1. Purpose and Scope

(a) Title 28, Chapter 45, authorizes the Rhode Island Apprenticeship Council to formulate and promote the furtherance of labor standards necessary to safeguard the welfare of apprentices and to extend the application of such standards by requiring the inclusion thereof in contracts of apprenticeship. Consistent with this mandate, the Rhode Island State Apprenticeship Council shall adopt Policies and Operating Procedures.

(b) The purpose of this regulation is to set forth labor standards to safeguard the welfare of apprentices, and to extend the application of such standards by prescribing rules and regulations concerning the registration of acceptable apprenticeship programs. These labor standards, rules and regulations cover the registration, termination and deregistration of apprenticeship programs and of apprenticeship agreements, and matters relating thereto.

(c) The provisions of this regulation shall apply to a person, firm, corporation or craft only after such person, firm, corporation or craft has voluntarily elected to conform with its provisions.

Sec. 2. Definitions

As used in this regulation:

(a) "Council" means the Rhode Island Apprenticeship and Training Council

(b) "Apprentice" means a person participating, through employment, in an approved schedule requiring not less than 2,000 hours of on job work experience supplemented by related instruction, and who is a party of an apprenticeship agreement registered with the Council.

(c) "Apprenticeship Agreement" means a written agreement which conforms to standards established under Title 28, Chapter 45 and these regulations, and is entered into between an apprentice and either (1) an employer, (2) an association of employers, (3) an organization of employees, or (4) a joint committee representing employers and employees.

(d) "Apprenticeship Program" means a plan containing all terms and conditions for the qualification, recruitment, selection, employment and training of apprentices, including such matters as the requirements for a written apprenticeship agreement.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(e) "Apprenticeship Standard" means the written document which sets forth the minimum labor standards required by law for training apprentices in a specified industry, area or plant. By reference, it is a part of the apprenticeship agreement. There are two basic types of standards - one providing for joint employer-union participation in the program and the second, referred to as unilateral standards, where responsibility for the apprenticeship is assumed by either management or organized labor, but not both. Normally, unilateral programs are sponsored by single employers.

(f) "Sponsor" means any person, association, committee, or organization operating an apprenticeship program and in whose name the program is approved and registered.

(g) "Employer" means any person or organization employing an apprentice whether or not such person or organization is a party to an apprenticeship agreement with the apprentice.

(h) "Apprenticeship Committee" means those persons designated by the sponsor to act for it in the administration of the program. A committee may be "joint ", i.e., it is composed of an equal number of representatives of the employer(s) and of the employees represented by a bona fide collective bargaining agent(s) and has been established to conduct, operate, or administer an apprenticeship program and enter into apprenticeship agreements with apprentices. A committee may be "unilateral" or "non-joint" and shall mean a program sponsor in which a bona fide collective bargaining agent is not a participant; it includes an individual non-joint sponsor (apprenticeship program sponsored by one employer without the participation of a union) and a group non-joint sponsor (apprenticeship program sponsored by two or more employers without the participation of a union).

(i) "Related Instruction" means an organized and systematic form of instruction designed to provide the apprentice with knowledge of the theoretical and technical subjects related to his/her trade.

(j) "Registration of an apprenticeship Program" means the acceptance and recording of such program by the Council as meeting the basic standards and requirements of the Council for approval of such program. Approval is evidenced by a certificate of registration or other written indicia.

(k) "Registration of an Apprenticeship Agreement" means the acceptance and recording thereof by the Council as evidence of the participation of the apprentice in a particular registered apprenticeship program.

Sec. 3. Eligibility and Procedure for Council Registration

(a) No apprenticeship program or agreement shall be eligible for Council registration unless it is in conformity with the requirements of Title 28, Chapter 45 and this regulation, and the training is in an apprenticeable occupation requiring not less than 2,000 hours of on job work experience and the characteristics set forth in Title 28, Chapter 45.

(b) Apprentices must be individually registered under a registered program. Such registration shall be effected by filing copies of each apprenticeship agreement with the Council. Registration shall be reserved for those desiring to learn a trade through a reasonably continuous employment. Agreements shall not be registered for persons desiring only interim work or employed on a substantially shorter work week than is prevailing in the industry. This, however, does not apply to students pursuing a course of study in the same trade or closely related to the trade for which application is being made for registration.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(c) The Council shall be notified promptly of the termination or suspension of any Apprenticeship agreement, with cause for same, and of apprenticeship completions.

(d) Approved apprenticeship programs shall be accorded registration, evidenced by a certificate of registra- tion.

(e) Any modification(s) or change(s) to registered standards shall be promptly submitted to the Council, and if approved, shall be recorded and acknowledged as a revision of such standards.

(f) The request for registration, together with all documents and data required by Title 28, Chapter 45 and this regulation, shall be submitted to the Council.

(g) Under a program proposed for registration by an employer or employers' association, where the standards, collective bargaining agreement or other instrument, provides for participation by a union in any matter in the operation of the substantive matters of the apprenticeship program, and such participation is exercised, written acknowledgement of union agreement or "no objection" to the registration is required. Where no such participation is evidenced and practiced, the employer or employers' association shall simultaneously furnish to the union, if any, which is the collective bargaining agent of the employees to be trained, a copy of its application for registration and of the apprenticeship program. The Council shall provide a reasonable time period of not less than 30 days nor more than 60 days for receipt of union comments, if any, before final action on the application for registration and/or approval.

(h) Where the employees to be trained have no collective bargaining agent, an apprenticeship program may be proposed for registration by an employer or group of employers.

(i) If the sponsor is involved in any abnormal labor condition such as a strike, lockout, or other similar condition, the application for an apprenticeship program may be withheld until such issue is resolved.

(j) If it should be determined by the Council that a sponsor is in violation of any Federal or State Labor laws or rules and regulations affecting registration of programs, the application for an apprenticeship program may be withheld until such issues are resolved.

Sec. 4. Criteria for Apprenticeable Occupations

An apprenticeable occupation is a skilled trade which possesses all of the following characteristics:

(a) Is customarily learned in a practical way through a structured systematic program of on-the-job supervised training;

(b) It is clearly identified and commonly recognized throughout an industry;

(c) It involves manual, mechanical or technical skills and knowledge which require a minimum number of hours as required by statute of on-the-job work experience; and

(d) It requires related instruction to supplement the on-the-job training.

Sec. 5. Standards of Apprenticeship

An apprenticeship program to be eligible for registration by the Council shall conform to the following stand-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ards:

(a) The program is an organized, written plan embodying the terms and conditions of employment, training, and supervision of one or more apprentices in the apprenticeable occupation, as defined in Title 28, Chapter 45, and this regulation, and subscribed to by a sponsor who has undertaken to carry out the apprentice training program.

(b) The following standards are prescribed for an apprenticeship program:

(1) A statement of the trade or craft to be taught and the required hours for completion of apprenticeship which shall not be less than the statutory minimum number of hours of reasonably continuous employment;

(2) An outline of work processes in which the apprentice will receive supervised work experience and training on the job, and the allocation of the approximate time to be spent in each major process;

(3) A statement of the number of hours to be spent in related instruction which shall not be less than the statutory minimum number of hours per year, provided that the Council may, in the best interest of apprenticeship, reduce the hours of related instruction of which instruction may be given in a classroom through trade or industrial courses, or by correspondence courses of equivalent value, or other forms of self-study approved by the Council;

(4) A statement that apprentices shall be not less than sixteen years of age, with the exception of a higher age requirement which the Council has determined applicable in accordance with the State and Federal Child Labor Laws;

(5) A statement of the progressively increasing scale of wages to be paid to the apprentice consistent with the skill acquired, the entry wage to be not less than the minimum wage prescribed by the Federal and State Labor Standards Acts, where applicable, unless a higher wage is required by other applicable Federal law, State law, respective regulations, or by collective bargaining agreement;

(6) A provision for probationary period reasonable in relation to the full apprenticeship term, with full credit given for such period toward completion of apprenticeship;

(7) A provision that during the period of probation, the Council shall be directed to terminate an apprenticeship agreement at the request in writing of any party thereto;

(8) A provision that after the probationary period, the Council shall be empowered to terminate an apprenticeship agreement upon agreement of the parties thereto, or for good cause on the Council's own motion after giving all parties notice and opportunity to be heard;

(9) Provision that the services of the Council may be utilized for consultation regarding the settlement of differences arising out of apprenticeship agreement and where the differences cannot be adjusted locally, or in accordance with the established trade procedure, and any such differences which cannot be amicably settled by the parties may be submitted to the Council for final decision;

(10) Provision for the numeric ratio of apprentice to journeymen consistent with proper supervision, training, safety, and reasonably continuity of employment, and applicable provisions in collective bar-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

gaining agreements, in relation to which it is recommended that a minimum ratio of no more than one apprentice for each journeyman regularly employed by a participating employer in each apprenticeable occupation be established;

(11) Provision for transfer of employer's training obligation when the employer is unable to fulfill the obligation under the apprenticeship agreement to another employer under the same program with the consent of the apprentice and apprenticeship committee or program sponsor, with full credit to the apprentice for satisfactory time and training earned;

(12) Provision for minimum qualifications required by a sponsor for persons entering the apprenticeship program;

(13) Provision for granting of an advanced standing or credit for previously acquired experience, training, or skills for all applicants equally, with commensurate wages for any progression step so granted;

(14) A provision that the employer shall instruct the apprentice in safe and healthful work practices and shall insure that the apprentice is trained in facilities and other environments that are in compliance with either the occupational safety and health standards promulgated by the Secretary of Labor under Public Law 91-596, or State standards that have been found to be at least as effective as the Federal standards;

(15) A provision for the placement of an apprentice under a written apprenticeship agreement, which shall directly, or by reference, incorporate the standards of the program as part of the agreement;

(16) A provision for periodic review and evaluation of the apprentice's progress in job performance and in related instruction, and the maintenance of appropriate progress records;

(17) A provision of recognition for successful completion of apprenticeship evidenced by an appropriate certificate;

(18) Identification of the registration agency;

(19) A statement that the regular work day or work week for apprentices shall not be greater than those of the journeymen:

(20) Provision for the registration, cancellation, and deregistration of the program, and requirement for the prompt submission of any modification or revision thereto;

(21) Provision for registration of apprenticeship agreements and revisions, notice to the Council of persons who have successfully completed apprenticeship programs, and notice of terminations and suspensions of apprenticeship agreements and causes therefor;

(22) A statement of how the committee is to be organized and a statement of the Functions of the committee are required if the program sponsor is a joint apprenticeship committee;

(23) A statement containing the equal opportunity pledge prescribed as follows: "The recruitment, selection, employment, and training of apprentices during their apprenticeship, shall be without discrimination because of race, sex, age, religion, color, ancestry, physical handicap, marital status, or arrest and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

court record";

(24) Name and address of the appropriate authority under the program to receive,

(25) process and make disposition of complaints;

(26) Provision for a participating employer's agreement; and

(27) All apprenticeship standards must contain articles to comply with Federal laws, regulations and rules pertaining to apprenticeship.

Sec. 6. Apprenticeship Agreement

The apprenticeship agreement shall contain explicitly or by reference:

(a) Name and signature of the contracting parties (apprentice, and the program sponsor or employer), and the signature of a parent or guardian if the apprentice is a minor:

(b) The date of birth of apprentice;

(c) Name and address of the program sponsor and registration agency;

(d) A statement of the trade or craft in which the apprentice is to be trained and the beginning date and term of apprenticeship;

(e) A statement showing:

(1) The number of hours to be spent by the apprentice in work on the job; and

(2) The number of hours to be spent in related and supplemental instruction;

(f) A statement setting forth a schedule of the work processes in the trade in which the apprentice is to be trained and the approximate time to be spent at each process;

(g) A statement of the graduated scale of wages to be paid the apprentice and whether or not the required school time shall be compensated;

(h) Statements providing:

(1) For a specific period of probation during which the apprenticeship agreement may be terminated by either party to the agreement upon notice to the Council; and

(2) That, after the probationary period, the agreement may be terminated at the request of the apprentice, or may be suspended, or terminated by the sponsor, for good cause, with due notice to the apprentice and a reasonable opportunity for corrective action, and with written notice to the apprentice and to the Council of the final action taken;

(i) A statement that the apprentice will be accorded equal opportunity in all phases of apprenticeship employment and training, without discrimination because of race, color, religion, ancestry, sex, age, physical handicap, marital status, or court and arrest record; and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(j) Name and address of the appropriate authority, if any, designated under the program to receive, process and make disposition of controversies or differences arising out of the apprenticeship agreement; any such controversies and differences which cannot be amicably settled by the parties may be submitted to the Council for final decision.

## Sec. 7. Deregistration of Council-Registered Program

Deregistration of a program may be effected upon the voluntary action of the sponsor by a request for cancellation of the registration or, upon reasonable cause, by the Council, instituting formal deregistration proceedings in accordance with the provisions of the regulation.

(a) Request by Sponsor. The Council may cancel the registration of an apprenticeship program by a written acknowledgement of such request stating, but not limited to, the following:

(1) The registration is cancelled at sponsor's request, and giving the effective date of such cancellation; and

(2) That, within 15 workdays of the date of the acknowledgement, the sponsor must notify all apprentices of such cancellation and the effective date; that such cancellation automatically deprives the apprentice of his/her individual registration.

(b) Deregistration by Council

(1) Deregistration proceedings may be undertaken when the apprenticeship program is not conducted, operated, or administered in accordance with the registered standards or the requirements of Title 28, Chapter 45, or this regulation.

(2) Where it appears the program is not being operated in accordance with the registered standards or with requirements of Title 28, Chapter 45, or this regulation, the Council shall so notify the program sponsor in writing.

(3) The notice shall be sent by registered or certified mail, return receipt requested, shall state the deficiency(s) and remedy(s) required and shall state that the program will be deregistered for cause unless the corrective action is taken within 30 days.

(4) Upon request by sponsor, the 30-day period may be extended for up to an additional 30-day period. During the period for correction, the sponsor may be assisted in every reasonable way by the Council.

(5) If the required action is not taken within the allotted time, the Council shall send a notice to the sponsor by registered or certified mail, return receipt requested, stating the following:

(i) This notice is sent pursuant to this subsection;

(ii) That certain deficiencies were called to the sponsor's attention and remedial actions requested;

(iii) Based upon the stated cause, the program will be deregistered, unless within 15 workdays of receipt of this notice, the sponsor requests a hearing; and

(iv) If a hearing is not requested by the sponsor, the program will be automatically deregistered.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(6) If the sponsor requests a hearing, the Council shall convene a hearing in accordance with Section 8 of these regulations.

(7) In its discretion, the Council may allow the sponsor a reasonable time to achieve voluntary correct-ive action. If the Council's decision is that the apprenticeship program is not operating in accordance with the registered standards or requirements of Title 28, Chapter 45, and this regulation, the appren-ticeship program shall be deregistered. In each case in which deregistration is ordered, the Council shall notify the sponsor.

(8) Every order of deregistration shall contain a provision that the sponsor shall, within 15 workdays of the effective date of the order, notify all registered apprentices of the deregistration of the program, the effective date, and that such action automatically deprives the apprentice of his/her individual registra- tion.

Sec. 8. Hearings

(a) Within 10 workdays of receipt of a request for a hearing, reasonable notice of such hearing shall be giv-en by registered mail, return receipt requested, to the appropriate sponsor. Such notice shall include:

(1) A reasonable time and place of hearing;

(2) A statement of the provisions of this regulation pursuant to which the hearing is to be held; and

(3) A concise statement of the matters pursuant to which the action forming the basis of the hearing is proposed to be taken.

(b) The Chairman of the Council shall regulate the course of the hearing. Hearings shall be informally con-ducted. Every party shall have the right to counsel, and a fair opportunity to present his/her case, including such cross-examination as may be appropriate in the circumstances. The Council shall render final decisions based on their findings.

Sec. 9. Reinstatement of Program Registration

Any apprenticeship program deregistered pursuant to Title 28, Chapter 45, and this regulation, may be reinstated upon presentation of adequate evidence that the apprenticeship program is operating in accordance with Title 28, Chapter 45, and this regulation. Such evidence shall be presented to the Council, if an order of deregistration were entered pursuant to a hearing.

Sec. 10. Complaints

(a) This section is not applicable to any complaint concerning discrimination or other equal opportunity matters; all such complaints shall be submitted, processed, and resolved in accordance with State or Federal Equal Opportunity laws.

(b) Any controversy or differences arising under an apprenticeship agreement which cannot be resolved loc-ally, or which is not covered by a collective bargaining agreement, may be submitted by an apprentice or his/her authorized representative to the Council for review. Matters covered by a collective bargaining agreement are not subject to such review.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

RI ADC 16 060 003                                                                                        Page 9
R.I. Code R. 16 060 003
16 060 CRIR 003

(c) The complaint, in writing, and signed by the complainant, or authorized representative, shall be submitted within 60 days of the final local decision. It shall set forth the specific matter(s) complained of, together with all relevant facts and circumstances. Copies of all pertinent documents and correspondence shall accompany the complaint.

(d) The Council shall render an opinion within 90 days after receipt of the complaint, based upon such investigation of the matters submitted as may be found necessary, and the record before it. During the 90-day period, the Council shall make reasonable efforts to effect a satisfactory resolution between the parties involved. If so resolved, the parties shall be notified that the case is closed. Where a decision is rendered, copies of the decision shall be sent to all interested parties which shall be final.

Sec. 11. **Reciprocity**

The determination of **reciprocity** with other states shall be determined by the Rhode Island State Apprenticeship Council on the basis of its evaluation of the requesting state's standards.

Sec. 12. Authority for Regulation

State Apprenticeship Council

Rhode Island Department of Labor & Training

1511 Pontiac Avenue, Building #70/2nd floor

P.O. Box 20247

Cranston, RI 02920-0943

Sec. 13. Effective Date of this Regulation

The Regulation becomes effective on 24th Day Oct. 2000.

<General Materials (GM) - References, Annotations, or Tables>
R.I. Code R. 16 060 003, RI ADC 16 060 003

RI ADC 16 060 003
END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.